**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| STUART C. WRIGHT, ET AL., | |
| Plaintiffs, | |
| v. | Case No. 4:18-CV-00865-NKL |
| CATELENT PHARMA SOLUTIONS, LLC & CATELENT CTS (KANSAS CITY) LLC, | |
| Defendants. | |

**ORDER**

Defendants Catalent Pharma Solutions, LLC & Catalent CTS (Kansas City) LLC (together, "Catalent" or "Defendants") move for summary judgment on all of the counts brought by plaintiffs Stuart Wright, Rayfield Hunt, Moses Ng'ang'a, Anthony Johnson, Arch Turner, and Stephen Wright. Docs. 17, 20. For the reasons discussed below, the motion for summary judgment is granted in part and denied in part.

## I.    Uncontroverted Facts

Each of the plaintiffs was employed as a pharmaceutical technician in the production department in the Kansas City facility of Catalent, a provider of advanced delivery technologies and development solutions for drugs, biologics, and consumer health products.

### A.  The Plaintiffs

Each of the plaintiffs, who are black males, alleges that he faced racial discrimination. In addition, some allege retaliation for reporting of racial discrimination or regulatory violations, and some assert claims for invasion of privacy.

### i. Hunt

Plaintiff Rayfield Hunt worked for Catalent from October 31, 2016 through August 5, 2019. Hunt was hired by Catalent as an Operations Supervisor, reporting to Operations Director Joe Dukich. However, Dukich subsequently purportedly concluded that Hunt lacked sufficient experience executing work and training people on unit operations, and Dukich therefore gave Hunt an ultimatum: he could remain in the Operations Supervisor role and eventually be terminated, or he could accept the position of Senior Technician. Hunt chose the latter option. However, his compensation remained the same. Hunt worked as a Senior Pharmaceutical Technician on the second shift from October 2017 until the end of his employment.

Between October 2016 and September 2017, Senior Pharmaceutical Technician Bob Bealmear interrupted Hunt, talked over him, refused to listen to him, pretended to throw his work phone in the trash, told people that Hunt stole lunches and water, called Hunt "lazy," described Hunt as not knowing "shit," and called Hunt and Ng'ang'a "boy." Supervisor Richard Makowski himself would call Hunt "boy."

In October 2017, Hunt complained to Makowski that Bealmear was harassing him. Makowski reported Hunt's concerns to his manager, Dukich, and then spoke with Bealmear about Hunt's concerns, coached him regarding workplace conduct, and reminded Bealmear that he and Hunt needed to work together. Still, Hunt's concerns continued, and he complained to Jason Luring regarding Bealmear's conduct, which appeared to Hunt to be racially motivated.

On October 13, 2017, Hunt complained to then Human Resources Manager Lauren Wolf about Bealmear's conduct, stating that it was "borderline or could be racial." Wolf purportedly investigated Plaintiff Hunt's concerns but concluded that Bealmear's alleged behavior was not harassing in nature, but rather, that he was merely a very difficult person to work with. When Hunt complained to Dukich that he was dissatisfied with Wolf's investigation, Dukich scheduled

an appointment for Hunt to discuss his concerns with Human Resources Director Adam Allmon. On November 27, 2017, Hunt discussed his concerns with Allmon. In late 2017, Hunt also complained to supervisor Angel Reyes about Bealmear's snide remarks. Reyes recommended that Hunt and Bealmear work on different projects to minimize their interactions.

On June 6, 2018, Hunt filed a complaint through Catalent's My Safe Workplace system, alleging that supervisor Michael Turner and Makowski targeted him after he filed a Charge of Discrimination with the EEOC.

On June 13, 2018, Luring met with Hunt regarding his concerns. Mr. Luring assured Hunt that he would get to the bottom of the situation, gave Hunt his telephone number, and instructed Hunt to call him with any additional concerns.

### ii. Ng'ang'a

Plaintiff Moses Ng'ang'a worked for Catalent and its predecessor from June 2007 through 2011 and again from January 28, 2014 through January 9, 2019. In 2015 or 2016, he transferred into a Pharmaceutical Technician position, and he remained in that position from September 2017 through the end of his employment.

Supervisor Makowski yelled at Ng'ang'a, scolded him, advanced at him like he wanted to fight him, lied about how Ng'ang'a set up equipment, would not greet him, and called him "boy." Senior Pharmaceutical Technician Bealmear threatened Ng'ang'a, yelled at him, and jumped at him like he was going to beat him up, told Ng'ang'a "that's not what your momma said last night" when Ng'ang'a asked Bealmear to get a bigger mop to clean the floor, told him "boy, don't let an old man whoop your ass because you're acting like a girl," put an empty tray of barbeque next to his desk, and would put Ng'ang'a's coffee cup in the refrigerator or other locations in the facility.

On October 24, 2017 and November 2, 2017, Ng'ang'a applied for a Senior Pharmaceutical Technician position on second shift. Ng'ang'a was subjected to onerous application requirements that at least one other applicant (a white applicant who, unlike Ng'ang'a, subsequently was promoted to a Senior Pharmaceutical Technician position) did not face: Operations managers Jody Snapp and Scott Collins required Ng'ang'a to write a six-page essay detailing why he should be promoted and a Standard Operating Procedure for a piece of equipment and to also come up with process improvements.

On November 29, 2017, Ng'ang'a interviewed for the Senior Pharmaceutical Technician position. The interview panel consisted of Martha Roe, Joshua Squire, and Makowski. Each panel member stated that Ng'ang'a did not demonstrate the competencies necessary for a Senior Pharmaceutical Technician position and performed poorly in the interview by talking over them, not allowing them the opportunity to answer questions, and even using his cell phone during the interview. Supervisor Reyes claimed that a primary reason for denying Ng'ang'a a promotion was that Ng'ang'a required additional training and that he took frequent breaks to eat and use his cell phone. Reyes, however, did not document incidents of excessive breaks for eating or use of Ng'ang'a's cell phone. Moreover, Reyes's performance evaluation for Ng'ang'a stated, "Moses's performance has greatly improved as his career progresses within Catalent. He has trained associates on several pieces of equipment . . . ."

Furthermore, supervisor Michael Turner described Ng'ang'a as "very knowledgeable," and stated that if he himself ever had problems, he "would actually go and ask [Ng'ang'a] to get some insight." Michael Turner would have liked Ng'ang'a to have reported directly to him. Michael Turner thought that Ng'ang'a "deserved a promotion" to the position of Senior Pharmaceutical Technician and that he was qualified for the position.

Catalent claimed that the Senior Pharmaceutical Technician position for which Ng'ang'a applied was placed "on hold" in spring 2018. The only explanation Catalent provided was that "they did not need the positions at that time." However, between the closing in spring 2018 of the position for which Ng'ang'a applied and the summer of 2018, a white pharmaceutical technician, Richard Roberts, who had applied for the same position to which Ng'ang'a had applied, was promoted to the position of Senior Pharmaceutical Technician. Ng'ang'a had more formal education and more experience at Catalent than Roberts.

For a period of time in 2018, Ng'ang'a was permitted to come in an hour early and earn overtime on the first shift in order to demonstrate his knowledge on the Bosch machine and to train on how to put the machine together. However, Catalent denied Ng'ang'a the opportunity to work overtime for purposes of training on the first shift in or about June 2018. Catalent claims that operations management denied Ng'ang'a the overtime opportunities because Ng'ang'a was not productively utilizing the overtime he was working on the first shift.

Ng'ang'a claimed that three of his white co-workers were, unlike himself, given the opportunity to train on the equipment in the first shift. But two of those co-workers were already assigned to work on the first shift, and the third was moved from the second shift to the first shift when Ng'ang'a observed him working there, so none were performing overtime on the first shift at the relevant time.

### iii. Stuart Wright

Stuart Wright worked for Catalent as an Associate Pharmaceutical Technician from January 2018 until October 24, 2018.

When he began reporting to Makowski in May 2018, he felt that racial discrimination became prevalent. The supervisor referred to Stuart Wright as "boy," "lazy," and having a "poor

work ethic." Makowski did not speak to employees of other races in such a manner. Makowski would monitor Stuart Wright's whereabouts, including the time he spent in the restroom. On June 27, 2018, Makowski asked another employee where Stuart Wright was. When that employee jokingly stated that Stuart Wright had gone to lunch—when in fact Stuart Wright was just on the other side of the room—Makowski replied, "that motherfucker better not went to lunch."

On June 29, 2018, Makowski asked Stuart Wright where Arch Turner was. When Stuart Wright replied that Turner was in Room 377, preparing to clean it, (ii) Makowski smirked and said that was a lie because Room 377 was already clean. Makowski told Wright to locate Turner and then return to Makowski's desk. Stuart Wright located Turner in Room 377 and the pair went to Snapp's office. Snapp asked where they had been, and Stuart Wright explained that they had been preparing to clean Room 377. Makowski accused Stuart Wright of lying, stating that Room 377 was already clean, and that he was sick of having to ask where Stuart Wright and Arch Turner were. Stuart Wright replied that Makowski was the problem because he blatantly lied about and disrespected black employees. Makowski responded, "How do I disrespect you? Hell, I don't talk to you boys." Stuart Wright told Snapp that having a supervisor who disrespects, degrades, and demeans black employees was not effective.

After the meeting, Snapp reported the substance of the meeting to Wolf, and Stuart Wright and Arch Turner separately complained to Wolf about Makowski's conduct. The June 2018 interaction with Wolf was Stuart Wright's first discussion with any member of Human Resources at Catalent regarding employment concerns.

### iv. Stephen Wright

Plaintiff Stephen Wright worked for Catalent as an Associate Pharmaceutical Technician from January 8, 2018 through his termination on July 16, 2018.

Supervisor Scott Collins would ask Stephen Wright about the whereabouts of other African American employees. Collins would ask Stephen Wright why he was not on the floor, and then he would accuse Wright of lying in response. Collins referred to the second shift—on which most of the African American employees ran processes—as the "lazy shift." Stephen Wright complained to supervisors Eric McKine and Mike Turner that he suspected Collins micromanaged him because of his race.

White co-worker Zach Maust referred to Ng'ang'a as "my boy," and "my nigga." However, Stephen Wright did not report any concerns regarding Maust to Catalent.

When there would be occasional down time on the second shift, employees would be instructed to find something to do, such as clean rooms or equipment, or work on SOPs. On multiple such occasions, Stephen Wright would be asked to collect trash or perform other menial tasks in lieu of working on SOPs, while white employees like Nathan Sullivan and Richard Roberts would be permitted to work on personal homework. Still, Stephen Wright acknowledged that Sullivan and Richard Roberts did not work on the same team as him.

### v. Johnson

Plaintiff Anthony Johnson worked for Catalent as an Associate Pharmaceutical Technician from December 11, 2015 through his termination on July 16, 2018.

On occasion, Makowski asked him for the whereabouts of Arch Turner. Otherwise, Makowski did not say anything to Plaintiff Johnson that he deemed inappropriate.

Johnson noticed that Collins scrutinized and monitored him more closely than he did white employees in his department. Collins also directed Johnson to stop working on Standard Operating Procedures ("SOPs"), and to complete tasks to help second shift. Throughout Johnson's

employment in the Production Department, Collins referred to the second shift as "lazy." However, Johnson did not hear any other racially derogatory language from Collins.

During his employment at Catalent, Plaintiff Johnson did not complain of any conduct that he believed violated the Respectful Workplace Policy, nor did he otherwise report concerns about discrimination. Prior to his termination, Johnson was not disciplined and did not receive any negative performance reviews.

### vi. Arch Turner

Plaintiff Arch Turner worked for Catalent as an Associate Pharmaceutical Technician from January 2018 through his termination in July 2018.

In April 2018, Makowski asked Arch Turner about his whereabouts while Turner was working on Standard Operating Procedures. Makowski instructed Turner to get back to work on other tasks. On multiple occasions, Makowski stormed up to him and aggressively asked, "what the fuck are you doing," and "where the hell have you been," and also asked him where Stuart Wright was. Arch Turner testified that, on one occasion, Makowski accused him and Stuart Wright of "always goofing off." Makowski's harassment and purportedly discriminatory conduct was "an everyday occurrence." Makowski did not treat white employees in the same manner.

Turner complained to Wolf in Human Resources on June 29, 2018 that Makowski was constantly harassing, verbally abusing, and attacking him and asking the whereabouts of African-American employees. He noted that Makowski called him and other black employees "boy." He complained that Makowski did not know how to interact with black employees, that he was constantly disrespectful and making him feel like a slave.

After Turner reported his concerns during the meeting with Stuart Wright and supervisor Snapp, Makowski began to ignore Turner entirely. On one occasion after he had complained about

Makowski, Turner asked Makowski about taking time off and Makowski acted like he did not want to speak with Turner. However, Makowski ultimately instructed Turner to turn in his time-off request.

### B. The "Reasonable Suspicion" Drug Test

Catalent's processing and finishing operations held a mandatory team-building event at a space called Power Play on July 13, 2018.

Hunt drove Stephen Wright to the event, and Stuart Wright drove Johnson and Arch Turner to the event. Stuart Wright, Johnson, and Arch Turner were in the banquet hall 10-15 minutes before Stephen Wright entered the banquet hall, and Hunt entered the banquet hall separately.[1] Except for these five plaintiffs (Stuart Wright, Stephen Wright, Johnson, Arch Turner, and Hunt), all of the Operations employees who attended the event arrived at Power Play by 11:00 a.m., the scheduled start-time.

Although Plaintiffs maintain that they entered at different times, supervisor Angel Reyes claims that Stuart Wright, Stephen Wright, Johnson, Arch Turner, and Hunt entered the banquet hall together, and as they passed by him through the single-person door to enter the banquet area, he smelled an odor of marijuana. However, he could not detect the smell of marijuana on any one of the plaintiffs. However, according to Stuart Wright, Stephen Wright, Johnson, Turner, and Hunt, all of whom had worked in close proximity with one another since approximately 6:30 a.m. that morning, none of them had ingested or been near marijuana that morning, and none of them emanated the odor of marijuana.

---

[1] Insofar as any facts are in dispute, the Court views the evidence in the light most favorable to Plaintiffs. *Johnson v. McCarver*, 942 F.3d 405, 2019 U.S. App. LEXIS 32772, at *1 (8th Cir. 2019).

Reyes reported his suspicions to Operations Director Dukich, who in turn directed him to consult with Human Resources Manager Wolf. At 11:28 a.m., Reyes texted Wolf as follows: "Crew of 5 – smell like weed. Going to have all supervisors verify." Reyes then asked multiple other managers, including Richard Makowski, Ardi Reyes, Jody Snapp, Scott Collins, and Michael Turner, if they could detect an odor of marijuana on the five plaintiffs who he claimed arrived together. Makowski spoke with each of the five plaintiffs at issue in an effort to confirm Reyes' suspicion, but he could not detect a marijuana odor. Ardi Reyes and Jody Snapp too attempted to confirm an odor of marijuana, but said, "I couldn't smell it." Scott Collins, too, could not confirm a marijuana odor.

When Reyes asked Operations Supervisor Mike Turner to confirm the smell of marijuana, he thought, "okay, I report to Angel, he's my boss, so I better get up." Reyes had stated that the five plaintiffs had "all went and sat down at a table to the right." However, according to Mike Turner, the plaintiffs, who had just come through the door, were standing near the door. Mike Turner said he "could faintly smell marijuana," and then he returned to his seat and gave Reyes "the nod."

After Turner confirmed that he smelled marijuana, Reyes contacted Wolf by phone and then waited for a representative from Human Resources and the third-party drug testing vendor to arrive at Power Play.

Plaintiffs Hunt, Stuart Wright, Johnson, Arch Turner, and Stephen Wright each initialed and signed an application that stated, "I . . . understand and agree that if I am employed, I may be required to submit to alcohol/drug testing under certain circumstances during my employment." Catalent's Kansas City Drug and Alcohol Policy states, in relevant part, as follows:

Reasonable Suspicion: A manager or Supervisor observation based on objective and articulate facts sufficient to lead him or her to suspect an employee is using drugs, alcohol, or in some way is unfit to safely perform his duties. . . .

When suspicious behavior is witnessed and documented by two supervisors/managers and approved by human resources, see reasonable suspicion form, an employee will be immediately requested to submit to a urine examination for illegal drugs and/or a blood or breath analysis for the alcohol level. . . .

All substance abuse testing information specifically relating to individual employees shall be treated as confidential and protected in accordance with law, Catalent Pharma Solutions policy, and these procedures. . . .

This policy must be implemented fairly for all associates and confidentiality maintained to protect the rights of the employees in accordance with the law and Catalent Pharma Solutions policy.

The policy specifically states that employees who test positive for drugs are subject to termination.

Despite the fact that Catalent's policy states that managers and supervisors are "accountable to ensure that individuals are removed from the workplace immediately when a Supervisor or Manager has reasonable suspicion that an employee shows signs of possible intoxication, [or] is under the influence of drugs or alcohol," the five plaintiffs purportedly suspected of drug use were permitted to participate in various activities at Power Play, including go-kart racing, laser tag , and "whirly ball," which uses bumper cars.

Around 1:30 p.m., Wolf arrived with forms for the drug screen, and Reyes indicated that he had detected a "marijuana odor" while Michael Turner indicated that he had detected a "faint marijuana odor" from Hunt, Stuart Wright, Stephen Wright, Arch Turner, and Johnson.

After an award ceremony at Power Play, Reyes asked the five plaintiffs he suspected to "hang back" to speak with him.  Then he asked them to follow him.  Reyes led the five men to a room marked "reserved."  The five plaintiffs observed co-workers and other Power Play patrons watching them.

In the "reserved room" were Wolf and a representative from the drug testing vendor. Wolf advised the five men that they were going to be tested for drugs. Hunt complained that the group was being racially profiled. However, of the 43 non-management employees who attended the Power Play event, 21 were white, 16 were black, four were Hispanic, and one was Native American. Still, the five men individually accompanied the vendor's representative to the Power Play men's restroom, amid other Power Play customers, to provide a urine sample. The door of the stall that the men had to use to provide urine samples was broken and the stall therefore was, in effect, open. Patrons of Power Play were walking in and out of the restroom as Hunt, at least, provided a urine sample.

Wolf informed the five men that they could not return to their activities at Power Play, that they needed to leave the premises, and that they were not to return to work until after their test results were available. Hunt, Stuart Wright, Stephen Wright, Anthony Johnson, and Arch Turner were placed on paid suspension pending the return of the tests.

### C. Release of the Drug Test Results

On July 16, 2018, Snapp and Wolf informed Stephen Wright by phone that his drug test was positive and that his employment was terminated. Afterwards, Hunt told Stephen Wright that he had received a call from his co-worker Chris Turner on Tuesday, July 17, 2018, and that Turner knew which of the Plaintiffs, including Stephen Wright, had failed the drug test.

Also on July 16, 2018, Wolf and Reyes informed Johnson that his test results were positive and that his employment was terminated. Afterwards, Johnson received a call from Chris Turner and text messages from two other co-workers about his failed test and termination.

On July 18, 2018, Snapp and Wolf informed Stuart Wright by phone that his test results were negative, that he would be paid for his time off of work, and that he could return to work the

following day. Even before Snapp and Wolf contacted him on July 18, 2018, Stuart Wright had learned the results of his drug screen (and the results of the other plaintiffs' drug screens) from a call he received from two co-workers the evening of July 16, 2018. Stuart Wright complained to Wolf that he felt that Catalent had "tried to blatantly sabotage five black employees." He asked for the rest of the week off to process the situation. Wolf offered him the rest of the week off, with pay, and Stuart Wright accepted.

On July 22, 2018, Luring called Hunt and informed him that he had tested negative and that he could return to work the following day. Hunt had already learned of the results of the tests (including the results for Stephen Wright, Arch Turner, Johnson, and Stuart Wright) on July 17, 2018 from Ng'ang'a, who had learned of the results from their nonsupervisory co-worker, Zach Maust. Maust told Hunt, "they're trying to figure out what to do with you and Ray." When Luring called, Hunt requested, and was granted, a few days off.

Snapp claims to have "attempted" to reach Arch Turner to inform him that his test results had come back positive, and that Catalent was terminating his employment. On July 19, 2018, Wolf mailed Arch Turner a letter informing him that she had made several unsuccessful attempts to reach him, and considered him to have abandoned his employment. Turner learned from a co-worker, Sierra Wright, who contacted him to "check in" on him, that he had failed his drug test and that his employment had been terminated.

The only individuals who had access to the five plaintiffs' drug test results were Allmon, Wolf, Reyes, Snapp, and Dukich. Yet, Michael Turner testified that he, Scott Collins, Richard Makowski, and Josh Squire were discussing the drug tests results with Snapp in an open area in the facility.

### D. Events Following the Drug Tests

#### i. Hunt

On July 26, 2018, Hunt complained during a town hall meeting that he believed that he, Stuart Wright, Stephen Wright, Johnson, and Arch Turner were racially profiled and targeted for the drug test. Dukich subsequently told Hunt that he should have expressed his concerns in a more professional manner, or face to face in a different setting. Hunt was issued a disciplinary "Coach and Counsel" because of his comments.[2]

The next day, July 27, 2018, Hunt received a negative review from Makowski. Hunt believes the negative review was unfounded and was issued in retaliation for his complaints.

#### ii. Ng'ang'a

In July 2018, Ng'ang'a received a performance review of "Partially Meets Expectations" for the period from July 2017 through June 2018. Ng'ang'a complained to Wolf in Human Resources and his supervisor Snapp that he believed his low rating was in retaliation for a complaint he had lodged with supervisor Angel Reyes about supervisor Makowski as well as a complaint regarding another review he had thought unfounded. Ng'ang'a also complained to Snapp that he believed that Makowski issued a poor performance review to him because Makowski was racist and did not like Ng'ang'a and that it was retaliation for Ng'ang'a's reporting of Makowski's racially discriminatory conduct a few days earlier. Ng'ang'a also complained to Snapp and Wolf that he believed he was passed over for promotion because of his race.

---

[2] Hunt received "Coach and Counsel" discipline once more for expressing frustration with workplace dynamics in a group email.

Ng'ang'a lodged additional complaints about race discrimination. He raised concerns about Makowski's behavior to Dukich, who in turn scheduled a meeting with the group to address any concerns with Ng'ang'a's performance.

Ng'ang'a complained to Reyes on July 16, 2018 about his treatment by Makowski. Reyes told Ng'ang'a that he would elevate his concerns to Human Resources, but Human Resources' Wolf and Snapp discussed with Ng'ang'a only his performance review, not his complaints of racial discrimination and retaliation.

In August or September 2018, Ng'ang'a made a complaint to the Catalent hotline regarding racial profiling and discrimination, alleging that he was directed to clean instead of being allowed to train on or run certain equipment. Ng'ang'a also accused Collins of retaliating against him for reporting his bleeding in the lab by not permitting Ng'ang'a to work on certain equipment, and he claimed that Collins made his work atmosphere intolerable by scolding him, yelling at him, and telling him to get back to work.

Ng'ang'a began looking for alternate employment in August 2018. He notified Catalent of his intent to resign only after he secured an offer of employment from his current employer in January 2019.

### iii. Stuart Wright

On July 23, 2018, Stuart Wright returned to work following the Power Play event and transitioned to second shift, where he began reporting to Collins. In a July 24, 2018 performance review, Collins informed Wright that he did not meet expectations because he had not been at Catalent long enough, and was not yet signed off on certain machines.

During work, Collins scrutinized the amount of time Stuart Wright took for restroom breaks—going so far as to time them—while Collins himself would leave for smoke breaks and

permitted white employees to do personal homework while on shift. Collins and Turner delegated cleaning tasks to the black employees who made complaints. Collins directed Stuart Wright to engage in behavior that jeopardized his job, such as going against good manufacturing processes by rushing through processing. On one occasion, when Stuart Wright was ill with a high temperature, sweats, and a cough, and Collins insisted that he continue working because he did not have any sick days.

Stuart Wright was unable to complete a training that was due on August 4, 2018 until August 24, 2018, because Angel Reyes, the only person approved to give him training, would not speak with Stuart Wright. However, Stuart Wright was not disciplined for the delay in training, and he admitted that his only attempt to communicate directly with Reyes was leaving a note on Reyes' desk.

Stuart Wright was scheduled for training on an encapsulation machine on August 23, 2018, but Makowski told him that the training was for encapsulation employees only, which caused the other employees to snicker and made him feel belittled.

Stuart Wright began looking for alternate employment in late July 2018. He notified Catalent of his intent to resign only after he had secured alternate employment in October 2018.

### E. Treatment of Makowski

On July 26, 2018, after the "town hall" meeting, Hunt complained to Dukich that he believed Makowski discriminated against him. Dukich then informed Hunt that Makowski would no longer be his supervisor, and that, instead, Collins would be his supervisor.

Wolf purported to conduct an investigation of Makowski, but Makowski was not even aware at the time of his deposition in this case that multiple complaints of race discrimination had been made against him. Wolf never interviewed Makowski regarding any plaintiff's allegations.

Still, after her "investigation," Wolf concluded that Makowski had an attitude problem, but that it was not premised in retaliatory or discriminatory animus.

Snapp decided to place Makowski on an "Action Plan" rather than terminating him. The Action Plan was not considered disciplinary in nature. Snapp counseled Makowski to be aware of how he spoke with people and to watch his tone.

### F. Reporting of Supervisor Collins' Contamination of Lab

On or about August 27, 2018, Operations Supervisor Scott Collins walked into a processing room, where the product was open, without wearing booties, sleeves, gloves, or hair net, while Ng'ang'a, Stuart Wright, and another pharmaceutical technician, Rosetta Allmon, were working on a commercial batch. Collins complained that the processing was taking too long, and then directed Stuart Wright to divert from standard operating procedures and good manufacturing process rules by taking equipment apart in the midst of processing.

While Collins was reviewing a batch record, Allmon noticed some blood on the top of her glove and wondered as to the source. The pharmaceutical technicians then observed that Collins' hand was dripping blood on to the floor and the lab processing tables. Ng'ang'a told Collins that he should shut the process down because he had bled in the processing room, and that they needed to report the situation to Quality Assurance. Stuart Wright accordingly stopped the processing machine, but Collins intervened, stating, "I'm the supervisor, I'll tell you all when to stop. I'll tell you who to call. This is behind. . . . I'm your supervisor, you'll do what I've instructed you to do." Collins attempted to clean his blood from the lab room, and in that process, he got blood on the batch record. Collins then took the batch record to his desk and contacted the Quality Assurance Department, claiming that he had bled at his desk, concealing the fact that he had bled in the lab processing room. Collins also wrote a "deviation" report indicating that he had bled at

his desk. Finally, Collins sent an e-mail to Product Lead Kristen Waner stating that he had gotten a spot of blood on the batch record from a paper cut.

Ng'ang'a and Stuart Wright both reported the situation to Sarah Campbell in Quality Assurance. However, Catalent denies having a record of any such complaint.

Stuart Wright also reported the incident to the Food and Drug Administration ("FDA"). Stuart Wright did not inform anyone at Catalent about his report to the FDA, and no one from Catalent asked him about the report to the FDA. Catalent does not have any record of being audited by the FDA regarding the incident or the batch of pharmaceutical products at issue. What became of the report to the FDA is unknown.

On July 15, 2019, Plaintiffs filed the Fourth Amended Complaint (Doc. 35), which asserted whistleblower claims relating to the incident with Collins. Soon after, Wolf and Snapp questioned Collins about the incident. Collins again denied bleeding in the processing room, and insisted that he had gotten a spot of blood on the batch record while reviewing the document at his desk, However, Catalent's Human Resources and Quality Assurance Departments concluded that Collins had committed "gross misconduct" by deviating from company procedure and misrepresenting his conduct, and Collins was terminated effective October 22, 2019.

## II.      Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010) (citing *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005)); Fed. R. Civ. P. 56(a).

### III.     Discussion

Plaintiffs bring claims for disparate treatment, hostile work environment, and retaliation under Title VII, claims for whistleblower retaliation, claims for invasion of privacy, and an ADEA claim.  The Court considers the claims in turn below.

#### A.  Claims of Disparate Treatment

##### i.  Whether Plaintiffs Stuart Wright, Hunt, Arch Turner, Johnson, and Stephen Wright Can Establish a Case of Disparate Treatment Relating to Drug Testing

In the absence of "direct evidence of discrimination," the *McDonnell Douglas* framework applies to claims of discrimination under Title VII.  *Bunch v. Univ. of Ark. Bd. of Trs.*, 863 F.3d 1062, 1068 (8th Cir. 2017); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  To establish a *prima facie* disparate-treatment case, each plaintiff must show that (1) he is a member of a protected group, (2) he was meeting his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances permit an inference of discrimination.  *Bunch*, 863 F.3d at 1068.  If the plaintiff makes this showing, the burden shifts to the employer to furnish "a legitimate, non-discriminatory justification for its adverse employment action."  *Id.* (quotation marks and citation omitted).  If the employer meets that burden, then the plaintiff must show that the employer's justification is merely a "pretext for discrimination."  *Id.* Plaintiff may demonstrate that the justification is mere pretext by showing that the defendant's "explanation is unworthy of credence because it has no basis in fact" or that "discriminatory animus more likely motivated" the defendant.  *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 975 (8th Cir. 2012).

The parties dispute whether the July 13, 2018 drug screenings to which Plaintiffs Stuart Wright, Hunt, Turner, Johnson, and Stephen Wright were subjected constituted adverse employment actions.

An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge," *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013).

The Eighth Circuit has implied that if there is evidence that drug testing is conducted in a racially discriminatory manner and the drug testing results in a tangible change in working conditions, the adverse employment action requirement is satisfied. *See Tatum v. City of Berkeley*, 408 F.3d 543, 551 (8th Cir. 2005) ("To the extent they contend that the drug testing itself was an adverse employment action, plaintiffs have identified no evidence from which the jury reasonably could have concluded that the drug testing was conducted in a racially discriminatory manner."); *Landon v. Northwest Airlines*, 72 F.3d 620 (8th Cir. 1995) (holding that termination based on positive drug test supported discrimination claim where manner of testing suggested pretext)

Here, two of the five plaintiffs who were subjected to drug-testing did not test positive for drugs and were not terminated because of the testing. Nor have they suggested any other tangible change in working conditions that occurred because of the negative drug test. Although they were required to leave the work event following the drug test, they were paid for their forced time off work. Absent some actual adverse action due to the drug testing, it cannot be said that the drug testing itself is an adverse employment action. Therefore, the claims of Hunt and Stuart Wright for disparate treatment based on drug testing fail.

As for the three plaintiffs who tested positive and were fired, there is no evidence from which a reasonable juror could find that the drug testing was racially motivated.

Plaintiffs primarily argue that the drug test was not based on any suspicion at all, much less reasonable suspicion as required by company policy. Construing the facts in the light most favorable to Plaintiffs, the Court assumes that there was no real suspicion for the drug test. Nonetheless, Plaintiffs have not presented evidence from which a reasonable juror could find that Angel Reyes, Mike Turner, or Wolf initiated the drug testing because of the Plaintiffs' race. A lack of reasonable suspicion does not mean that the Plaintiffs were tested because of their race.

"A plaintiff alleging disparate treatment may survive summary judgment by either: (1) showing direct evidence of discrimination or (2) presenting an inference of discrimination under the McDonnell Douglas framework." *Rinchuso v. Brookshire Grocery Co.*, 944 F.3d 725, 729 (8th Cir. 2019). "Under the McDonnell Douglas framework, a plaintiff establishes a prima facie case of disparate treatment by showing they: (1) belong to a protected class; (2) were meeting the employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) were treated differently than similarly situated employees outside the protected class." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817 (1973); *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013)).

In order to establish that a similarly situated employee not in his protected class was treated differently, the Plaintiff must identify an employee who was "similarly situated in all relevant respects." *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) (quoting *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012)). The comparators "need not have committed the exact same offense but must have engaged in conduct of comparable seriousness." *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (quotation omitted). Although "the burden

of establishing a prima facie case of disparate treatment is not onerous, the plaintiff must be able to produce some evidence of similarity between her and her comparator." *Rebouche v. Deere & Co.*, 786 F.3d 1083, 1087–88 (8th Cir. 2015) (internal citations and quotations omitted). *See also Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 435-6 (8th Cir. 2016) (where employer had not found that comparators had committed any violent acts in the workplace, those individuals were not similarly situated to the plaintiff, who had).

Plaintiffs have not identified individuals of a different race who were similarly situated in all respects but were treated more favorably than they were. *See Ghane v. West*, 148 F.3d 979, 982 (8th Cir. 1998) (concluding that plaintiff's "disparate treatment argument is insufficient as a matter of law to support a reasonable inference that appellee's proffered reasons are pretexts for intentional discrimination based on race because [plaintiff] ha[d] not demonstrated that those individuals to whom he compares himself are similarly situated in all relevant respects"); *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir. 2004) ("For discriminatory discipline claims, employees are similarly situated only when they are involved in or accused of the same offense and are disciplined in different ways. . . . While instances of disparate treatment can support a claim of pretext, [plaintiff] must prove that she and [the comparator] were similarly situated in all relevant respects.") (quotation marks and citations omitted). Although Plaintiffs argue that the reasonable suspicion policy should have been applied to require tests for those who were consuming alcohol at Power Play, that argument is without merit. Catalent had authorized consumption of alcohol at the event, and Plaintiffs do not suggest that Catalent similarly had authorized marijuana use. Those who drank at the company-sponsored event with the company's permission thus were not "similarly situated."

While Plaintiffs have presented evidence that, viewed in the light most favorable to the Plaintiffs, suggests that Catalent supervisors did not actually smell marijuana and that the drug-tested plaintiffs were not in a group as the Catalent supervisors testified, Plaintiffs have not shown that there were white employees who were not tested under similar circumstances or who were not fired after they tested positive for drugs. In addition, there were eleven other black employees at the Power Play event, including plaintiff Ng'ang'a, who were not subjected to a drug test. While this factor is not dispositive (*see Connecticut v. Teal*, 457 U.S. 440, 455-56, 102 S. Ct. 2525, 2535 (1982) ("It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.")), it further supports the finding that there is no evidence of racial discrimination in the drug testing. *See Onyiah v. St. Cloud State Univ.*, No. 08-4948 (MJD/LIB), 2011 U.S. Dist. LEXIS 52380, at \*\*26-27 (D. Minn. May 16, 2011) (finding that plaintiff "cannot establish a prima facie case for discrimination based on race or national origin" where, *inter alia*, "there were other professors hired by the same decision maker who are of the same race and national origin who were paid higher salaries").

Finally, even if the decision by Reyes, Wolf, and Mike Turner to drug test the five plaintiffs violated company policy, a policy violation by itself is not necessarily probative of discriminatory intent. *See Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1077 (8th Cir. 2013) (finding summary judgment in favor of defendant proper where plaintiff did not "explain how this purported policy violation is probative of [defendant]'s discriminatory intent."); *Maull v. Div. of State Police*, 39 F. App'x 769, 774 (3d Cir. 2002) ("[T]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent . . . . We agree with the District Court that simply pointing to

violations is inadequate without evidence that white State Troopers were treated differently by Defendants with respect to these policies.") (quotation marks and citations omitted).

In short, Plaintiffs have failed to present evidence that the drug testing was racially discriminatory. *See Xuelin Zhuang v. Datacard Corp.*, 414 F.3d 849, 855-56 (8th Cir. 2005) ("With regard to facts permitting an inference of discrimination, we find none. . . . We require probative evidence of intentional discrimination, not mere allegations based upon facts that as a matter of law are insufficient to establish discrimination.").

Defendants therefore are entitled to summary judgment on the disparate-treatment claims based on the drug test.

### ii.  Whether Ng'ang'a Can Establish a Case of Race Discrimination

#### a.  Failure to Promote

A *prima facie* claim of discrimination in failure to promote requires showing that (1) plaintiff is a member of a protected group, (2) he applied for an available position for which he was qualified, (3) he was not promoted, and (4) similarly-situated employees who were not part of the protected group were promoted instead. *Bennett v. Nucor Corp.*, 656 F.3d 802, 819-20 (8th Cir. 2011).

In November 2017, Ng'ang'a, who is black, applied and interviewed for a promotion to the position of Senior Pharmaceutical Technician.[3]  One of the other nine applicants for the

---

[3] The complaint alleges that Ng'ang'a "was denied promotions because of his race," but the November 2017 promotion is the only promotion discussed in the complaint.  Doc. 35, ¶¶ 47-49, 138.  Ng'ang'a also did not respond to Defendants' argument that "because Ng'ang'a filed his Charge of Discrimination on October 5, 2018, his only timely promotion claim relates to a Senior Pharmaceutical Technician Positions [*sic*] he applied and interviewed for in November 2017." Doc. 100, p. 11.  Thus, the November 2017 application for promotion appears to be the only promotion at issue in this case.

position was Ng'ang'a's fellow employee Richard Roberts, who was then a pharmaceutical technician. Roberts is white. Ng'ang'a and Roberts were the only internal applicants for the position who held the title of pharmaceutical technician.

There is no dispute that the Senior Pharmaceutical Technician position for which Ng'ang'a applied, which was left open until March 2018, was never filled. Defendants claim that they simply "did not need the positions at that time." However, between March 2018 and summer 2018, Roberts, the other Catalent pharmaceutical technician who applied for the Senior Pharmaceutical Technician position, was promoted to a Senior Pharmaceutical Technician position.

Defendants claim that Roberts' promotion was "to an entirely different Senior Pharmaceutical Technician position" and argue that "Ng'ang'a has not pointed to any case law which suggests the subsequent promotion of a purported comparator to an entirely different position in a different group is sufficient to demonstrate a prima facie failure to promote claim under Title VII." Doc. 111, p. 18. Defendants also imply that the position was in a different "group" and that Roberts' promotion was "in-line," which, according to Plaintiffs, means that it was based on a supervisor's subjective beliefs rather than the objective requirements that a promotion with Defendants ordinarily requires. Defendants further argue that "Roberts was in a different reporting structure than Ng'ang'a and it is undisputed that no one within the same Operations Manager's reporting structure as Ng'ang'a received a promotion to a Senior Pharmaceutical Technician position during that same time period." Thus, in short, Defendants' first argument is that Ng'ang'a has failed to establish the fourth element of a *prima facie* case— that similarly-situated employees who were not part of the protected group were promoted over him.

Because of the timing of the availability of the two Senior Pharmaceutical Technician positions, and the fact that Roberts applied to the first and was given the second position, the Court cannot rule on the motion for summary judgment that the Senior Pharmaceutical Technician positions were distinct. The fact that no one from the same "Operations Manager's reporting structure" as Ng'ang'a was promoted to the Senior Pharmaceutical Technician position does not establish as a matter of law that no similarly-situated employees were promoted.

Defendants next argue that Ng'ang'a was not qualified for the position. Supervisor Reyes claimed that a primary reason for denying Ng'ang'a a promotion was that Ng'ang'a required additional training and that he took frequent breaks to eat and to use his cell phone. However, Reyes did not document Ng'ang'a's purportedly taking excessive breaks for eating or to use his cell phone. Moreover, in Ng'ang'a's performance evaluation, Reyes stated, "Moses's performance has greatly improved as his career progresses within Catalent. He has trained associates on several pieces of equipment . . . ." This could support an inference that Reyes' criticisms of Ng'ang'a were not credible. *See Widoe v. Dist. # 111 Otoe Cty. Sch.*, 147 F.3d 726, 730 (8th Cir. 1998) (finding, where member of selection committee "herself wrote a favorable letter of recommendation for plaintiff," that "when the facts are viewed in the light most favorable to plaintiff, defendant's alleged dissatisfaction with" plaintiff's application raised "a genuine issue of fact regarding the pretextual nature of the[] proffered reasons").

Supervisor Michael Turner, who worked with Ng'ang'a daily, testified that Ng'ang'a was his "hardest worker," one of his "best," and "one of the best operators on second shift." He noted that Ng'ang'a "jumped in on an opportunity to learn some new processing" and "[b]uilt his skills up, crosstraining . . . ." Michael Turner also testified that if he ever had problems, he "would

actually go and ask Ng'ang'a to get some insight." Michael Turner thought that Ng'ang'a "deserved a promotion" to the position of Senior Pharmaceutical Technician.[4]

Ng'ang'a claims that he had both a significantly longer employment history with Catalent and more experience than did Roberts. In fact, Ng'ang'a trained Roberts. Moreover, Ng'ang'a had a college education, while Roberts did not. Ng'ang'a also claims that he was subjected to more stringent requirements when applying for the position. He was asked to write a six-page essay explaining why he should be promoted, to draft a Standard Operating Procedure on a piece of equipment, and to suggest process improvements. Ng'ang'a submitted the requested paperwork, but later learned that Roberts at least was not asked to complete such tasks, and yet Roberts nonetheless was promoted. These subjective requirements that purportedly were not uniformly imposed could support an inference of improper motive. *Cox v. First Nat'l Bank*, 792 F.3d 936, 940 (8th Cir. 2015) ("An employer could invent subjective criteria for promotions in order to mask discrimination."). In fact, Roberts, the individual who was promoted to Senior Pharmaceutical Technician, observed what he perceived as racially discriminatory treatment of Ng'ang'a and expressed concern that Ng'ang'a had not been promoted because of his race.

In short, even excluding Roberts statements on the ground that they constitute hearsay, Ng'ang'a, who is black, applied for a Senior Pharmaceutical Technician position that was left open until March 2018, around which time a purportedly new Senior Pharmaceutical Technician position was created and given to a white employee with less education and experience who had applied for the same Senior Pharmaceutical Technician position to which Ng'ang'a had applied. Although Defendants claim that the two Senior Pharmaceutical Technician positions were

---

[4] On the other hand, Michael Turner testified that Roberts, whom he directly supervised at the time of his promotion, was a "more knowledgeable performer" than Ng'ang'a and that Roberts, "by far, had more knowledge of the whole area" than did Ng'ang'a.

technically different, a reasonable factfinder could conclude, based on the temporal proximity of the two position openings and the fact that an individual who applied to the first was promoted to the second, that Ng'ang'a effectively was passed over for promotion in favor of Roberts. A reasonable factfinder could find that Ng'ang'a, who trained Roberts on some equipment, was the superior candidate.

In the face of objective evidence of Ng'ang'a's qualification, Defendants argue that "each of the members of the panel for Ng'ang'a's interview stated he did not demonstrate the competencies necessary for the Senior Pharmaceutical Technician position and performed poorly in his interview." Doc. 100, p. 11. One of the factors the interviewers noted was that Ng'ang'a used his cell phone during the interview—and Ng'ang'a has not denied doing so.

Nonetheless, Defendants' decision not to promote Ng'anga was based on subjective factors. The Eighth Circuit has held that, although "subjectivity alone does not render an employment decision infirm," *Brooks v. Ameren UE*, 345 F.3d 986, 988 (8th Cir. 2003), an "employee should not bear the same burden of proving a prima facie case of discrimination when the employer's promotion criteria are subjective and the process vague and secretive as when the case involves objective criteria which apply to all applicants," *Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931, 939 (8th Cir. 2007). In the face of Defendants' subjective decision-making, Ng'ang'a's superior education, greater experience, and higher seniority are sufficient to raise a question of fact as to whether Roberts was actually better qualified for the position. *See Mathis v. Fedex Freight Sys.*, No. 08-3003, 2009 U.S. Dist. LEXIS 138889, at **5-6 (W.D. Ark. Jan. 9, 2009) ("From this evidence it can be seen that the basis for the promotions—whatever it might have been—was fairly subjective, leaving open the possibility that reasonable jurors might believe or disbelieve the reasons given by Zeigler for her decisions. For example, Mathis had a better

track record on meeting her sales quotas than did either Deere or Wells. . . . A trier of fact may 'infer the ultimate fact of discrimination from the falsity of the employer's explanation.'" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097 (2000))); *cf. Brooks*, 345 F.3d at 988 ("Brooks was not obviously more qualified than the selected candidates").

Thus, Ng'ang'a has presented sufficient evidence from which a reasonable juror could find that he was not promoted because of race discrimination.

### b. Denial of Overtime

Defendants argue that the three comparators that Ng'ang'a identified for his argument that he was not paid overtime because of racial discrimination were themselves not paid overtime, and therefore Ng'ang'a cannot succeed in establishing disparate treatment with respect to overtime. Plaintiffs have not responded to Defendants' argument on this point. The Court therefore concludes that Ng'ang'a cannot make a *prima facie* case on the basis of denial of overtime. Defendants are entitled to summary judgment on the claim for overtime.

### c. Denial of Overtime as Failure-to-Train

Ng'ang'a argues that, in the complaint, he "alleges that he was denied the opportunity to work overtime so he could train on different pieces of equipment in order to receive a promotion." Doc. 105, p. 24. However, the complaint does not contain any allegation relating to denial of opportunities to train. Doc. 35. While the complaint alleges that "Ng'ang'a was denied the opportunity to work overtime, whereas other white employees were allowed to work overtime," this allegation appears to pertain only to "overtime hours," not opportunities to train. *Id.*, ¶¶ 51, 135. Because the failure-to-train allegation was not raised in Ng'ang'a's administrative Charge of Discrimination (Doc. 35-3), the Court declines to consider the allegation here. *See Toles v. Coastal Mart, Inc.*, 97 F. App'x 61, 61-62 (8th Cir. 2004) (finding that district court acted within its

discretion in declining to permit plaintiff to proceed on new theory raised for first time in opposition to summary judgment motion where discovery had ended).

### iii.   Whether Hunt's Demotion Claim is Time-Barred

Defendants argue that Hunt's claim of disparate treatment related to his October 2, 2017 demotion from an Operations Supervisor position to a Senior Pharmaceutical Technician position is time-barred because he did not file his Charge of Discrimination until September 11, 2018, nearly a year after the demotion and outside the 300-day limitations period.  Hunt does not dispute that the Charge of Discrimination was not filed within the 300-day limitations period.  Instead, Hunt argues that the limitations period should be deemed tolled on equitable grounds.

"[E]quitable tolling is appropriate when the plaintiff, despite all due diligence, is unable to obtain vital information bearing on the existence of his claim."  *Kirklin v. Joshen Paper & Packaging of Ark. Co.*, 911 F.3d 530, 534 (8th Cir. 2018) (quotation marks and citation omitted). The question is "whether a 'reasonable person' in a plaintiff's situation would have been aware of the existence of a claim."  *Id.*

Hunt argues that he was not aware of the existence of his claim until "late 2019," when he learned that he had been treated differently from supervisor Makowski, who is white.  Doc. 105, p. 34.  While Hunt was demoted without any probationary period or opportunity to turn things around, Makowski, who had been accused of racial discrimination and was found after investigation to "basically just [have] had an attitude problem," was placed on an "Action Plan." Thus, Plaintiffs argue,  "[d]ifferent standards were applied to Hunt than Richard Makowski." However, Plaintiffs do not argue that the basis for Hunt's demotion—which Defendants say was the product of his not having had sufficient experience, rather any disciplinary problems—was comparable to the conduct for which Makowski was put on an action plan.  *See Chappell v. Bilco*

*Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012) ("Chappell has not demonstrated that similarly situated employees were treated more favorably. . . . We do not know whether these employees committed the 'same offense' that Chappell did under the attendance policy, and we do not know how these other employees were disciplined.").

More fundamentally, Plaintiffs' argument that Hunt was not aware of the possibility that race played a role in his demotion is belied by the fact that, as of July 13, 2018, Hunt had complained to a Human Resources representative about discrimination and the failure of the Kansas City Human Resources Department to do anything about it. As Plaintiffs point out, Hunt wrote on August 24, 2018 to the Area Human Resources Director, "I asked you on 13JUL18 to come to Kansas City and have a face to face not only with me but other Africa[n] Americans that are constantly being harassed . . . ." Doc. 105, p. 32. Thus, Hunt suspected racial discrimination in his employment at least as early as July 13, 2018, when the statute of limitations had not yet run on his claim. Indeed, Plaintiffs describe this correspondence as Hunt's "complain[t] that th[e] Defendants did nothing to respond to his 2017 complaint and the discriminatory and harassing treatment of his [*sic*] continued." In other words, Plaintiffs concede that Hunt had complained about racial discrimination and harassment as early as 2017—well within the 300-day limitations period.[5]

Based on Plaintiffs' account, a reasonable person in Hunt's position would have been aware of a claim before the end of 2017. Equitable tolling therefore does not apply. Hunt's claim with respect to his demotion is time-barred.

---

[5] Hunt also complained about his demotion—though on the ground that it was retaliatory, not on the ground that it was racially discriminatory—through a June 6, 2018 My Safe Workplace Hotline. Doc. 100-22. In the June 6, 2018 complaint, Hunt stated, "I contacted the EEOC." This complaint, too, was lodged within the 300-day limitations period.

### B. Claims of Hostile Work Environment

To establish a hostile-work-environment claim under Title VII, each plaintiff must show that "(1) []he is a member of the class of people protected by the statute, (2) []he was subject to unwelcome harassment, (3) the harassment resulted from h[is] membership in the protected class, and (4) the harassment was severe enough to affect the terms, conditions, or privileges of h[is] employment." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 806 (8th Cir. 2019) (quotation marks and citation omitted). Notably, "[t]o be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007) (quotation marks and citation omitted). Moreover, "[a]llegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment." *Id.* (quotation marks and citation omitted).

The facts underlying each plaintiff's hostile-work-environment claim are set forth and analyzed below.

### i. Stuart Wright

In mid-June 2018, supervisor Makowski asked another employee where Stuart Wright and Arch Turner were. The employee jokingly said that the two men had gone to lunch, though they in fact were on the other side of the room. Makowski "got mad, . . . turn[ed] red," and stated, "That motherfucker better not went to lunch."[6]

---

[6] Plaintiffs acknowledge that the expletive "is not racial on its face" but argue that it "becomes racial when applied only to employees of a particular race or eth[n]ic group . . . ." Doc. 105, p. 36.

In late June 2018, Stuart Wright complained of race discrimination to Operations Manager Jody Snapp and Human Resources Manager Lauren Wolf, expressing concerns that Makowski was discriminating against him on the basis of race and that Makowski "didn't know how to deal with black employees" and was trying to sabotage him and Arch Turner. As examples, Stuart Wright states that "Makowski would frequently ask him the whereabouts of other African-American employees, including Arch Turner, but would never ask about the whereabouts of other white employees." On at least one occasion, when Stuart Wright stated the location of Arch Turner, Makowski accused Stuart Wright of lying.

After he complained of race discrimination, Makowski would monitor and scrutinize Stuart Wright more closely than he did other employees on a daily basis. Makowski even monitored how much time Stuart Wright spent in the bathroom.

Stuart Wright complained to Lauren Wolf more than once that Makowski used the term "boy" or "boy" in a demeaning fashion when referring to black employees. Makowski did not refer to employees who were not black as "boys."[7]

Stuart Wright claims that he continued to experience racial discrimination and harassment after he returned to work following the drug test under the supervision of Scott Collins. Collins, like Makowski, scrutinized Stuart Wright, including the length of his bathroom breaks, but did not similarly scrutinize white employees. In fact, Collins permitted white employees to leave the work area for hours at a time to perform personal tasks, including homework. While Scott delegated

---

[7] The Court does not discuss in this section acts that Stuart Wright claimed to witness that were directed at other individuals. *See Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011) (affirming grant of summary judgment in Title VII case where three of the four incidents plaintiff cited were not directed to him).

menial tasks to black employees, he allowed white employees time to complete online computer training.

Human Resources' Wolf did not investigate Stuart Wright's complaints. In fact, although Jody Snapp testified that she discussed Stuart Wright's concerns with Wolf, Wolf denied that such a meeting took place.

On their face, most of the comments and actions that Stuart Wright complains of were not racially charged. Even assuming that Makowski's use of such terms as "boy" and "lazy" carried a racial overtone, the statements were neither so pervasive nor so extreme as to affect Stuart Wright's working conditions. *See Elmahdi v. Marriott Hotel Servs.*, 339 F.3d 645, 653 (8th Cir. 2003) (finding that, under Section 1981, which is analyzed using the same standards that apply to Title VII claims, calling plaintiff "boy" and "black boy" on "a few occasions over a period of years," while offensive, did not rise to the level of a "steady barrage of opprobrious racial comment sufficient to support a hostile work environment claim"); *Kamal Al-Zubaidy v. TEK Indus.*, 406 F.3d 1030, 1039 (8th Cir. 2005) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.") (quotation marks and citations omitted); *Gatewood v. Columbia Pub. Sch. Dist.*, 415 F. Supp. 2d 983, 989, 1001 (W.D. Mo. 2006) (finding that, "[g]iven the current case law of the Eighth Circuit," the implication that employee should know where the prison is because of his race, asking if he did not like to attend staff meetings because he was the only African-American present, and remarking to another employee in plaintiff's presence that she was "tanning as if [she was] trying to be black" "were not sufficient to sustain a finding of a hostile work environment"); *Hawkins v. Vantage Point Behavioral Health, LLC*, No. 13-5224, 2014 U.S. Dist. LEXIS 168373, at *11 (W.D. Ark. Dec. 2, 2014) (finding that facts did not "rise to the level that would constitute

a hostile work environment under Title VII" where plaintiffs alleged that "on a regular basis" and "on numerous occasions," their supervising nurse made "various racially offensive comments," including referring to them as "[b]oys," saying that she "knew [they] must love fried chicken and watermelon," and remarking on their "thick, black hair").

As for Stuart Wright's statement that Makowski accused him of lying, the conduct is not actionable under Eighth Circuit law. *See Bradley v. Widnall*, 232 F.3d 626, 631-32 (8th Cir. 2000) (finding that, while allegations that plaintiff's "supervisory duties were curtailed, that she was left out of the decision-making process, treated with disrespect, and subjected to false complaints . . . may have resulted in a frustrating work situation," they were not "so severe or pervasive as to have affected a term, condition, or privilege of her employment").

In short, the conduct that Stuart Wright has alleged is neither so extreme nor sufficiently pervasive as to support a finding of hostile work environment. *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004) ("A hostile work environment exists when the workplace is dominated by racial slurs, but not when the offensive conduct consists of offhand comments and isolated incidents.").

### ii. Stephen Wright

Stephen Wright states that Collins selected "favorite[]" white employees whom he treated with respect while treating him in an abusive manner. (Plaintiffs do not explain how Collins treated white employees who were not among his "favorites.") Collins frequently asked Stephen Wright the whereabouts of other black employees, seeming to assume that Stephen Wright would know their whereabouts because they were all black. Collins micromanaged the work of black employees but did not do so for white employees. Collins once accused Stephen Wright of lying about his whereabouts. Like Stuart Wright, Stephen Wright observed Collins permitting white

employees to conduct personal business, including homework, on company time. Stephen Wright was not given the opportunities that white employees, including Richard Roberts and Nathan Sullivan, were provided to complete computer-based training.

Collins frequently referred to those on the second shift, who were predominantly black employees, as "lazy." He permitted employee Zach Maust to refer to black employees as "boys" and to use the term "niggers" in general conversation.

Stephen Wright complained of Collins' disparate scrutiny of black employees to manager Eric McKine. Stephen Wright also complained to manager Michael Turner of the incident in which Collins accused Stephen Wright of lying about his whereabouts. However, Defendants did not respond to his complaints.

Stephen Wright's complaints concern conduct that certainly is "rude and unpleasant," but not "extreme." Any racially-charged statements were neither so pervasive nor so severe as to affect Plaintiffs' working conditions. *Elmahdi*, 339 F.3d at 653; *Bainbridge*, 378 F.3d at 759; *Hawkins*, 2014 U.S. Dist. LEXIS 168373, at *11. As discussed above, false accusations, even combined with other disrespectful conduct, is not actionable in the Eighth Circuit. *Bradley*, 232 F.3d at 631-32. Defendants thus are entitled to summary judgment on Stephen Wright's hostile-work-environment claim.

### iii. Arch Turner

Arch Turner accuses Makowski of "constantly" scrutinizing him, asking him about the whereabouts of other black employees, using derogatory language, and lying about his whereabouts. He states that he never saw Makowski treat white employees as he did black employees. Johnson similarly testified that Makowski often asked him about Arch Turner's whereabouts.

On one occasion, after Arch Turner reported to the Quality Assurance Department his observation of a live insect in the lab, Makowski stormed into the room and angrily demanded to know "where the hell" Arch Turner had been and "what the fuck" he had been doing. Makowski accused Arch Turner and Stuart Wright of "always goofing off" and threatened to report them for it, despite the fact that Makowski permitted white employees to spend hours of working time performing personal homework.

On another occasion, Makowski, together with another white employee, stormed towards Arch Turner in the locker room and demanded "what the hell" he was doing and "where the fuck" he had been. Makowski and the other employee did not explain why they had been looking for Arch Turner.

On a different occasion, Arch Turner was working on required computer-based training when Makowski asked plaintiff Johnson about Arch Turner's whereabouts. When Makowski found Arch Turner, he "immediately started to yell and fuss and told [him] to hurry up and get to the back." In the meantime, white employees, including Zack Maust, Stephen Maust, and Lyle McGuire, were permitted to continue laughing, playing, and joking around instead of working.

Finally, as discussed above, in mid-June 2018, Makowski asked another employee where Stuart Wright and Arch Turner were. The employee jokingly said that the two men had gone to lunch, though they in fact were on the other side of the room. Makowski "got mad, . . . turn[ed] red," and stated, "That motherfucker better not went to lunch."

While inappropriate in the workplace, disrespectful language and race-based assumptions are not so extreme as to rise to the level of workplace harassment in the Eighth Circuit. *See Gatewood*, 415 F. Supp. 2d at 989 (finding that, *inter alia*, the implication that employee should know where the prison is because of his race was "not sufficient to sustain a finding of a hostile

work environment").  In the absence of a suggestion that the lack of computer-based training affected any plaintiff's employment, the testimony that Makowski prevented Arch Turner from completing required computer-based training while permitting white employees to complete such training does not support a finding of unreasonable interference with work performance. Defendants thus are entitled to summary judgment on Arch Turner's claim asserting hostile work environment.

### iv.  Anthony Johnson

Johnson testified that Makowski frequently asked him the whereabouts of other black employees.  He also complained that Makowski frequently referred to the second shift, which was composed primarily of black employees, as "lazy."  Johnson was monitored and scrutinized more closely than his white peers and supervisors.

Collins would prevent Johnson from completing his required computer-based training while permitting white employees to complete theirs.

As discussed above, assumptions based on race and use of such terms as "boy" are not sufficient to make a case of hostile work environment.  *See Hawkins*, 2014 U.S. Dist. LEXIS 168373, at *11 (W.D. Ark. Dec. 2, 2014) (finding that allegation that supervisor referred to plaintiffs as "[b]oys" and said she "knew [they] must love fried chicken and watermelon" did not "rise to the level that would constitute a hostile work environment under Title VII").

### v.  Moses Ng'ang'a

In support of his hostile-work-environment claim, Ng'ang'a cites the denial of his requests for opportunities to work overtime to train on additional pieces of equipment in contrast with white employees, the fact that Ng'ang'a was subject to more stringent requirements to apply for the Senior Pharmaceutical Technician position, Defendants' refusal to promote Ng'ang'a to the Senior

Pharmaceutical Technician position and subsequent promotion of a white competitor to the same title, and the statement by pharmaceutical technician Richard Roberts that Ng'ang'a was treated differently and had not been promoted because of his race. These incidents did not impact the conditions of Ng'ang'a's employment either so severely or pervasively as to create a hostile work environment. *See Bainbridge*, 378 F.3d at 759 ("A hostile work environment exists when the workplace is dominated by racial slurs, but not when the offensive conduct consists of . . . isolated incidents.").

### vi. Rayfield Hunt

According to Hunt, his white co-worker Bealmear called him "boy" and made demeaning comments to other white employees about Hunt's supervisory work. When Hunt reported that he was not being treated on par with the white supervisors, Makowski merely laughed and did nothing. Hunt made similar complaints to Angel Reyes, as well as Manger Dukich, Human Resources Director Adam Allmon, and Human Resources Manager Wolf. After Hunt thus complained, he received an unfounded negative performance review.

One fellow employee's use of the term "boy," even alongside other purportedly demeaning remarks, does not suffice to establish a hostile work environment. *Elmahdi*, 339 F.3d at 653; *Bainbridge*, 378 F.3d at 759; *Hawkins*, 2014 U.S. Dist. LEXIS 168373, at *11.

\* \* \*

Because of the high legal standard applicable to hostile-work-environment claims in the Eighth Circuit, Defendants are entitled to summary judgment on each of those claims.

### C. Title VII Retaliation Claims

"To establish a retaliation claim under Title VII, an employee must show that he engaged in statutorily protected conduct, that he suffered an adverse employment action, and that the

protected conduct was a but-for cause of the adverse action." *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013). The protected conduct must be in opposition to "any practice made an unlawful employment practice" under Title VII. 42 U.S.C. 2000e-3(a).

For the purpose of their motion for summary judgment, Defendants "concede[] Plaintiffs Hunt, Stuart Wright, Turner, and Ng'ang'a engaged in conduct protected by Title VII." Doc. 100, p. 30. The parties dispute whether Ng'ang'a exhausted his administrative remedies as to the retaliation clam, whether Hunt, Stuart Wright, and Ng'ang'a suffered an adverse employment action, and whether the protected conduct is a but-for cause of the adverse action.

### i. Whether Ng'ang'a Exhausted His Administrative Remedies as to Retaliation

Defendants argue that Ng'ang'a did not exhaust his administrative remedies with respect to his retaliation claim relating to purported denial of promotion and a negative performance review because his Charge of Discrimination alleged only race discrimination. Plaintiffs' only response is to summarize Ng'ang'a's retaliation-related allegations as follows:

> As previously noted, Ng'ang'a was not promoted because of his complaints regarding online [*sic*] promotion of Roberts. Thereafter, he also received a negative performance review. Plaintiff's charge references the promotion and the fact that he received a negative review.

Thus, Plaintiffs do not argue that Ng'ang'a's Charge of Discrimination alleged retaliation. Indeed, it did not. Ng'ang'a's Charge of Discrimination alleges only racial discrimination, and it does not even mention any internal complaint or other reporting of the suspected racial discrimination.

Because Ng'ang'a did not raise retaliation in his Charge of Discrimination, he has not exhausted his administrative remedies for the retaliation claim. *See Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 688 (8th Cir. 1998) ("Although a plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or

reasonably related to the substance of charges timely brought before the EEOC, it is well established that retaliation claims are not reasonably related to underlying discrimination claims.").

### ii. Whether Ng'ang'a and Stuart Wright Exhausted Their Administrative Remedies with Respect to Their Claims for Constructive Discharge

Ng'ang'a claims to have been constructively discharged in January 2019, but he did not amend his October 2018 Charge of Discrimination, or file a new Charge of Discrimination, to allege constructive discharge. Similarly, Stuart Wright claims that he was constructively discharged in October 2019, but he did not amend his July 2018 Charge of Discrimination, or file a new Charge of Discrimination, to allege constructive discharge. Defendants argue that Ng'ang'a and Stuart Wright failed to exhaust their administrative remedies with respect to retaliation claims based on constructive discharge.

Outside of reciting case law concerning what constitutes constructive discharge, Plaintiffs present no response to Defendants' argument that Plaintiffs have failed to exhaust their administrative remedies with respect to claims concerning constructive discharge. *See* Doc. 105, pp. 50-51.

The Eighth Circuit has held that a complainant must file a charge with respect to each alleged unlawful employment practice, including those that are related to a prior charge filed with the EEOC. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012) ("Each discrete act is a different unlawful employment practice for which a separate charge is required. Richter failed to exhaust the retaliation claim, and the district court correctly dismissed the claim on that basis.") (citation omitted). Because Ng'ang'a and Stuart Wright did not file Charges of Discrimination relating to constructive discharge, Defendants are entitled to summary judgment on the claims relating to constructive discharge.

### iii. Whether Hunt and Stuart Wright
### Suffered an Adverse Employment Action

Hunt and Stuart Wright contend that the drug screening was an adverse employment action that they suffered after complaining of racial discrimination. As discussed above, under Eighth Circuit law, the drug screen itself cannot constitute an adverse action if it did not result in a material and tangible change in the terms of the plaintiff's employment. Neither Hunt nor Stuart Wright has presented evidence of such a change following from the drug test. Accordingly, their claims for retaliation based on the drug test cannot survive summary judgment.

Stuart Wright contends in addition that he suffered an adverse employment action because he received a negative performance review in 2018 that was used to deny him raises and promotion opportunities. The Eighth Circuit has held that "[p]erformance ratings that have a negative impact on promotion potential do not constitute an adverse employment action unless the rating actually led to the denial of the promotion." *Turner v. Gonzales*, 421 F.3d 688, 696 (8th Cir. 2005). Stuart Wright has not identified any such denial of promotion. He also has failed to specify the pay raises he purportedly was denied. Thus, the claim of retaliation with respect to the negative performance reviews is not supported by sufficient evidence in the record.

Hunt similarly claims that a negative performance review he received constituted an adverse action, but Plaintiffs do not suggest that the review altered the terms and conditions of Hunt's employment. Therefore, he has not established an adverse employment action.

Finally, Stuart Wright argues that he suffered an adverse employment action because he "continued" to experience harassment after complaining. If the harassment did not change after Stuart Wright complained (and his description suggests that there was no change), then there is no factual basis upon which to claim that the harassment was retaliatory. In other words, if Stuart

Wright's complaint did not materially worsen the harassment, then the subsequent harassment cannot be said to be an adverse employment action for purposes of his retaliation claim.

### iv. Whether Arch Turner Can Make a Case for Retaliation

Arch Turner argues that the drug screen that resulted in his termination was performed in retaliation for his June 2018 complaint of discrimination by Makowski. Because Turner has presented no direct evidence of retaliation, the *McDonnell Douglas* applies. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 888 (8th Cir. 2015). Accordingly, Turner must show that: "(1) []he engaged in protected activity, (2) []he suffered an adverse employment action, and (3) a causal connection exists between the two." *Id.* There is no dispute as to the first element, and Defendants have conceded the second element for the purpose of the summary judgment motion. Accordingly, the question here is whether a causal connection exists between the adverse employment action—the drug test that resulted in Turner's termination—and his earlier complaint about Makowski.

Notably, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 2533 (2013)

The evidence of retaliatory motive to which Plaintiff Turner points is the timing of the two events. He complained on June 29, 2018, and the drug test occurred on July 13, 2018. However, generally, "a temporal connection alone is not sufficient to establish a causal connection." *Turner*, 421 F.3d at 696-697 (finding that timing supported inference of causation where "interim" performance review occurred five days after complaint about discriminatory treatment and less than two months after regular annual review in which plaintiff had received a "Superior" rating).

Turner has not presented any other evidence from which a reasonable juror could conclude that retaliatory animus motivated the drug screen.

Plaintiffs have not suggested that only people who complained about discrimination were subjected to the drug screening. Indeed, they cannot, because Johnson, who also was subjected to the drug screening, testified that he never reported concerns of discrimination during his employment. *See Humphrey v. Dresser-Rand Co.*, No. 12-0032 JCH, 2013 WL 4805804, at *10 (E.D. Mo. Sept. 9, 2013) (granting summary judgment to defendant on Title VII retaliation claim where, *inter alia*, "there exist[ed] no evidence that similarly situated employees who did not complain of harassment or discrimination were treated better").

As discussed with regard to Plaintiffs' disparate-treatment claims, the failure of Reyes, Turner, and Wolf to have reasonable suspicion for the drug tests would not permit a rational juror to conclude that they conducted the drug test because of Plaintiff Turner's earlier complaint about racial discrimination. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 971 (7th Cir. 2012) (holding that "a technical violation of policy was insufficient to give rise to an inference of a retaliatory motive").

Finally, there is no evidence to support an inference that Turner's complaint to Wolf two weeks earlier about Makowski's harassment led Angel Reyes and Mike Turner to fabricate a reason for drug-testing Arch Turner in the hope of terminating him. While Plaintiffs argue that Angel Reyes knew of Arch Turner's complaint about Makowski, they provide no citation for this suggestion, and at his deposition, Reyes denied knowing of Arch Turner's racial discrimination complaint. Plaintiffs do not suggest, or present evidence, that Mike Turner knew of—let alone that he was motivated by—the complaint. Makowski himself was not involved in the drug testing

process—indeed, he claimed that he could not smell the odor of marijuana on any of the plaintiffs who were subjected to the drug test.

In short, there is insufficient evidence of a causal connection between Arch Turner's complaint about Makowski's conduct and the drug screening.

### D. Whistleblower Retaliation Claims

Ng'ang'a and Stuart Wright allege whistleblower retaliation claims based on their internal report and an external report to the Food and Drug Administration concerning the conduct of supervisor Scott Collins that they suspected violated federal regulations. Missouri's Whistleblower Protection Act protects employees who report an employer's misconduct that violates a regulation or public policy. Mo. Rev. Stat. § 285.575. To succeed upon such a claim, a plaintiff must demonstrate that (1) he reported serious misconduct that violated the law and well-established public policy, (2) the employer terminated him, and (3) his reporting was a "motivating factor" for the termination. *Van Kirk v. Burns & McDonnell Eng'g Co.*, 484 S.W.3d 840, 844-45 (Mo. Ct. App. 2016); Mo. Rev. Stat. § 285.575.2(5).

Here, Ng'ang'a and Stuart Wright claim that they were constructively discharged. However, they each fail to show that their reporting was a "motivating factor" for their termination.

As a preliminary matter, complaining to the person who is purportedly acting unlawfully is not whistleblowing. *Drummond v. Land Learning Found.*, 358 S.W.3d 167, 171 (Mo. App. W.D. 2011) ("[A] report of wrongdoing to the wrongdoer is insufficient to invoke the whistleblowing public policy exception.") (citing cases). Thus, any complaint that Ng'ang'a or Stuart Wright might have registered with Collins himself cannot form the basis of their whistleblower claim.

Insofar as either Ng'ang'a or Stuart Wright complained internally or to the FDA, they have not established causation between any such complaint and their constructive discharge. In response to Defendants' argument that they have not established causation, Plaintiffs have pointed to nothing in the record to suggest that the purportedly intolerable conditions to which they were subjected were the product of their complaints about regulatory violations. They recite the standard, but fail to identify any supporting evidence. Doc. 105, p. 58. Because they have not argued, let alone presented evidence, that their complaints to anyone other than Collins himself were a "motivating factor" in their purported constructive discharge, Ng'ang'a and Stuart Wright cannot withstand summary judgment on their whistleblower claims.

### E. Invasion of Privacy Claims

Plaintiffs Stuart Wright, Stephen Wright, Hunt, Johnson, and Arch Turner claim that Defendants violated their privacy rights by (1) forcing them to undergo a drug screen in a public restroom at Power Play, and (2) publishing the fact of the drug screen and the results of the tests to other employees.

To succeed on a claim for publication of a private matter under Missouri law, a plaintiff must establish the following elements: "(1) publication or publicity, (2) absent any waiver or privilege, (3) of private matters in which the public has no legitimate concern, (4) so as to bring humiliation or shame to a person of ordinary sensibilities." *Chasnoff v. Mokwa*, 466 S.W.3d 571, 579 (Mo. Ct. App. 2015) (quotation marks and citation omitted).

"Publication means communication to the public in general or to a large number of persons, as distinguished from one individual or a few." *St. Anthony's Med. Ctr. v. H. S. H.*, 974 S.W.2d 606, 610 (Mo. Ct. App. 1998). "The critical aspect of the publication requirement is public disclosure—communications that are available to the general public, communications that have a

likelihood of becoming public knowledge." *Childs v. Williams*, 825 S.W.2d 4, 9 (1992) (Mo. Ct. App. 1992). Even if "private facts are communicated . . . to a large group of persons, if by that communication the private facts are not made public," then that communication is "of no consequence" under Missouri law. *Id.*

Plaintiffs state that, on "the Monday following Plaintiffs' drug screen results, and before Plaintiffs knew anything about the results of their drug screens, non-supervisory level employees learned the results of Plaintiffs' drug screens." Plaintiffs have identified six employees who knew of the drug screen results: Maust, Javier Estrada, Kimo Lanclos, Chris Turner (son of manager Michael Turner), Sierra Wright, and Ng'ang'a. In addition, Michael Turner stated that he and a few other supervisors discussed the matter—purportedly because it concerned their work plans— days after the tests were performed, in a large, open area of the Catalent facility. However, the discussions among a handful of Catalent employees do not suggest that the underlying facts were likely to become "public knowledge." The private information was neither so salacious nor the communication so open as to suggest broad publicity would follow. Therefore, the other employees' knowledge of the drug screen results and consequent terminations is not a sufficient basis for a claim for publication of a private matter.

Plaintiffs' assertion that the manner in which the drug screen was conducted gives rise to a cause of action for invasion of privacy fares no better. Even accepting that the five plaintiffs subjected to the drug screen were forced to provide samples from a stall that was in effect open because the door was broken, Plaintiffs have not suggested that any member of the public saw them providing urine samples. Thus, the element of publication is, again, lacking.

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' privacy claims.

### F.  ADEA Claim

Defendants argue that Hunt's ADEA claim, which was based on his October 2, 2017 demotion from Operations Supervisor to a Senior Pharmaceutical Technician position, is time-barred because Hunt did not file a Charge of Discrimination regarding the demotion until September 11, 2018, nearly a year after the occurrence.  Plaintiffs did not respond to Defendants' arguments concerning Hunt's ADEA claim.

The ADEA requires that the Charge of Discrimination be filed within 300 days of the occurrence of the allegedly unlawful employment practice.  29 U.S.C. 626(d)(1).  Because Hunt's Charge of Discrimination was not filed within 300 days of the demotion, his ADEA claim is time-barred.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment, Doc. 99, is granted in part and denied in part. Defendants' motion for summary judgment as to Ng'ang'a's claim for discrimination based on failure to promote (asserted in Count I) is DENIED.  Defendants' motion for summary judgment on all other claims is GRANTED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  March 17, 2020
Jefferson City, Missouri